RAGGI, Circuit Judge, filed a concurring opinion.
SACK, Circuit Judge.
The defendant-appellant Michael Ravelo appeals from a judgment of the United States District Court for the Eastern District of New York (John Gleeson, Judge) convicting Ravelo, after a plea of guilty, of conspiracy to commit assault in aid of racketeering, under 18 U.S.C. § 1959(a)(6), making a false statement to a federal agent, under 18 U.S.C. § 1001(a)(2), and credit card fraud, under 18 U.S.C. § 1029(a)(2) & (c)(1)(A)(i). The court sentenced Ravelo principally to 48 months’ incarceration, followed by three years’ supervised release, and ordered him to make restitution in the amount of $87,345.82. On appeal, Ravelo contends that he was. entitled to a minor role adjustment under United States Sentencing Guidelines (“U.S.S.G.” or “Guidelines”) § 3B1.2(b), and that the district court erred in treating each of Ravelo’s repeated unsuccessful attempts to draw down an amount approximating the cash-advance limit of a credit card as a separate intended loss amount under U.S.S.G. § 2Bl.l(b)(l). We disagree and therefore affirm.
BACKGROUND
At all relevant times, Ravelo was a member of the Luquer Street Boys, a Brooklyn, New York, street gang. On July 1, 1999, Ravelo, together with other members of the gang, traveled in one of a caravan of two automobiles to a hangout of the Hard Pack, a rival street gang. The purpose of the trip, according to Ravelo, was to “go beat up” members of the Hard Pack “with bats and golf clubs, among other weapons[,] in retaliation for a prior altercation between the two groups.” Tr. of Pleadings Before Hon. Marilyn D. Go, Mar. 13, 2002 (“Plea Tr.”), at 25-26. Although one of the two automobiles belonged to Ravelo, on instructions of a superior, another gang member drove that car.
Before departing, Ravelo expected a fight, but he did not, according to his lawyer, anticipate gunfire. While en route, however, Ravelo learned that another passenger was armed. Ravelo nonetheless continued to participate in the planned assault.
As the Luquer Street Boys’ caravan drove by the Hard Pack hangout, a member or members fired shots from the caravan, and members of the Hard Pack returned fire. The members of the Luquer Street Boys then fled the scene. Although, fortuitously, no one was injured during the exchange of fire, shortly thereafter Thomas Palazatto, a member of the Luquer Street Boys, was shot and killed, apparently by Hard Pack members in retaliation for the shootout that the Luquer Street Boys had initiated.
On June 27, 2001, New York City police officers arrested Ravelo on unrelated state *268 charges of credit card fraud.[1] The following day, while Ravelo was held in police custody, he was questioned about the Pala-zatto murder. According to his later admission during the course of plea proceedings, Ravelo “told the detective ... that [he had] witnessed the murder of [Palazatto but] ... really didn’t see it.” Plea Tr. at 27-28. Ravelo later conceded that the statement to New York City police regarding Palazatto’s murder was false and indicated that he thought that in addition to the police officer, an agent of the federal government was present at the time he made it.
Based on his participation in the shootout, Ravelo was charged in an information filed in the United States District Court for the Eastern District of New York with conspiracy to commit assault in aid of racketeering in violation of 18 U.S.C. § 1959(a)(6).[2] Based on his statement regarding Palazatto’s murder, Ravelo was also charged with making a false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2). In a proceeding on March 18, 2002, before United States Magistrate Judge Marilyn D. Go, Ravelo sought to plead guilty to both counts. After inquiring into Ravelo’s state of mind and hearing his admissions to the conduct described above, the magistrate judge recommended that Ravelo’s guilty plea be accepted, a recommendation later adopted by the district court.
Between June 2002 and September 2002, while Ravelo was free on bail on the conspiracy and false statement charges, he used the social security numbers of his landlord, Riqi Wang, and others to apply fraudulently for credit cards that he then used in multiple attempts to transfer money to himself via Western Union. Ravelo fraudulently obtained at least eight credit cards issued under the names of eight different persons. Two of these cards— the “Heenan card” and the “Wang card”— appear to have had cash-advance limits of $6,000 and $600 respectively. Ravelo made nine unsuccessful attempts to obtain either $500 or $600 using the Wang card on July 21 and 23, 2002. On August 17 and 18, 2002, he made seven attempts, also all unsuccessful, to use the Heenan card to obtain various amounts each approximating $6,000. On the basis of these failed attempts to transfer money to himself, and other uses of fraudulently procured credit cards not at issue in this appeal, Ravelo was charged by information in the United States District Court for the Eastern District of New York with one count of credit card fraud under 18 U.S.C. § 1029(a)(2) *269 and (c)(l)(A)(i). On November 12, 2002, he pled guilty before the district court to this count.
On March 14, 2003, Ravelo appeared before the district court for sentencing with respect to the crimes charged in both informations. The court determined that Ravelo’s criminal history category was III, and that his total offense level was 20, resulting in a Guidelines imprisonment range of 41 to 51 months. On the assault count, the court imposed a sentence of 36 months’ imprisonment, the statutory maximum, and one year’s supervised release. On each of the false statement and credit card counts, the court imposed a sentence of 48 months’ imprisonment and three years’ supervised release. The court noted that it had the power under the Guidelines to impose consecutive sentences for the crimes charged in the two informa-tions. Agreeing with Ravelo and the government, however, and in light of Ravelo’s enrollment in a substance abuse program, the court decided not to do so, observing that it had been persuaded “not to separate these Siamese twins we’ve got here.” Tr. of Sentencing Hearing Before Hon. John Gleeson, Mar. 14, 2003 (“Sentencing Tr.”), at 22.[3] The result was a net sentence of 48 months’ imprisonment and three years’ supervised release. The district court also imposed a $300 special assessment, and ordered Ravelo to make restitution in the amount of $37,345.82, reflecting the harm caused by successful fraudulent credit-card transactions conducted by him and by a co-conspirator.
On appeal, Ravelo challenges two determinations made by the district court in calculating his offense level: (1) its rejection of Ravelo’s application for a minor role adjustment pursuant to U.S.S.G. § 3B1.2(b); and (2) its calculation of the intended loss under U.S.S.G. § 2B1.1(b)(1) based upon the sum of the amounts sought in the multiple unsuccessful attempts to withdraw approximately the cash-advance limit on a credit card rather than upon the amount of the cash-advance limit.

DISCUSSION

I. Standard of Review
We review a district court’s factual findings made in the course of imposing a sentence under the Guidelines for clear error and the application of the Guidelines to those findings for abuse of discretion, unless the application presents a purely legal question, in which case we employ a de novo standard of review. United States v. Deming, 269 F.3d 107, 109 (2d Cir.2001). A district court’s legal interpretation of the Guidelines is subject to de novo review. United States v. Mullings, 330 F.3d 123, 124 (2d Cir.2003).
II. Minor Role Adjustment
An adjustment for a defendant’s minor role under U.S.S.G. § 3B1.2(b) “is warranted only if the defendant is ‘substantially less culpable than the average participant.’ ” United States v. Jeffers, 329 F.3d 94, 103 (2d Cir.2003) (quoting U.S.S.G. § 3B1.2 cmt. n.3(A) (2002)). The burden of proof to establish that a defendant qualifies for a minor role adjustment is on the defendant. In making this “highly fact-specific” determination, United States v. Shonubi, 998 F.2d 84, 90 (2d *270 Cir.1993), a district court looks to factors such as “the nature of the defendant’s relationship to other participants, the importance of the defendant’s- actions to the success of the venture, and the defendant’s awareness of the nature and scope of the criminal enterprise,” United States v. Yu, 285 F.3d 192, 200 (2d Cir.2002) (citation and internal quotation marks omitted).
According to the district court:
[Ravelo’s] role in [the conspiracy to commit assault in aid of racketeering] was integral. He provided the car....
He was part of a gang. He went to pick up fellow gang members, to find some members of a rival gang to assault. It was obviously foreseeable to him that other — that any dangerous weapons available, whether it’s bats or golf clubs or firearms, would be used. He’s lucky no one was hurt, despite the shoot-out. There is no merit whatsoever to the argument that he should receive a mitigating role adjustment. I reject it.
Sentencing Tr. at 5. There is no basis for Ravelo’s argument that the district court’s findings of fact in this regard are erroneous, let alone clearly so.
In applying the law to these facts, the district court did not abuse its discretion in declining to characterize Ravelo’s role in the assault crime as “minor.” This conclusion is fully supported by the court’s findings that Ravelo was a member of a gang, knew the gang was going to attack a rival gang, supplied a car, and provided support by his presence as a passenger in the car, even if he did not commit or intend to commit the assault himself.
Ravelo’s contention that he was only following orders does not require a contrary conclusion. Perhaps it indicates that Ravelo did not conceive the crime, but it does not show that he was “substantially less culpable than the average participant.” Jeffers, 329 F.3d at 103; see also Yu, 285 F.3d at 200 (stating that “to be eligible for a reduction, the defendant’s conduct must be ‘minor’ ... as compared to the average participant in such a crime” (internal quotation mark omitted)); Shonubi, 998 F.2d at 90 (concluding that it was not clearly erroneous for a district court to decide that a “lowly courier” was not entitled to a minor role adjustment on the basis of status).
III. Loss Calculation
Under U.S.S.G. § 2131.1(b)(1), the offense level of a defendant who engages in credit card fraud (or another “economic offense,” such as theft or embezzlement) resulting in a loss exceeding $5,000 is based upon a graduated loss table. As applied to this case, the table provides that if Ravelo caused a loss of more than $30,000 but not greater than $70,000, the offense level would increase by 6. U.S.S.G. § 2Bl.l(b)(l)(D). But if he caused a loss of more than $70,000, the offense level would increase by 8. Id. § 2Bl.l(b)(l)(E).
Subject to certain exceptions not applicable here, “loss” in this context is defined as “the greater of actual loss or intended loss.” U.S.S.G. § 2B1.1 cmt. n.3(A). “Intended loss,” in turn,
(I) means the pecuniary harm that was intended to result from the offense; and
(II) includes intended pecuniary harm that would have been impossible or unlikely to occur {e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).
The United States Sentencing Commission added the definition of “intended loss” in U.S.S.G. § 2B1.1 cmt. n.3(A)(ii), quoted above, to resolve a split among the Circuits. Prior to the adoption of this application note, some federal courts of appeals *271 had held that “intended loss” only encompassed possible loss, invoking a policy of punishing criminals in light of “economic reality” or “amounts put at risk.” See U.S.S.G., Supp. to App. C, amend. 617 (2001). The definition of “intended loss” now makes clear, however, that a loss may be intended irrespective of whether it could actually occur.
Although there is no direct documentary evidence in the record to this effect, the district court appeared to accept Ra-velo’s representation that two of the credit cards involved in Ravelo’s scheme — the Heenan card and the Wang card — had cash-advance limits of $6,000 and $600 respectively. Ravelo made seven attempts, all unsuccessful, to use the Heenan card to obtain various amounts approximating $6,000; he also made nine unsuccessful attempts to obtain either $500 or $600 using the Wang card. Ravelo contends that these unsuccessful attempts represent a total intended loss of $6,600. He reasons that the maximum amount of loss he sought to cause to his intended victims by his use of the cards was the maximum the banks would have advanced to him under the cards’ limits: $6,000 + $600 = $6,600. The government successfully argued in the district court to the contrary: In its view, each unsuccessful attempt to withdraw $6,000 using the Heenan card or $600 using the Wang card was an independent attempt to cause loss. The court therefore concluded that all of the attempts to cause loss should have been added together to determine the total intended loss.
The district court’s view of the matter is reflected in the following exchange:
MR. Willstatter [Ravelo’s counsel]: .... We believe — we know with respect to the Heenan and Wang cards that the Wang card had six hundred dollars cash advance limit. The Heenan card had a six thousand dollar cash advance limit, which is why there were attempts to get — to get that amount of money.
So we think that it highly exaggerates the loss in the case to say that because Michael Ravelo tried six [sic] times to get the approximately six thousand dollars, that that’s forty-two thousand dollars in loss....
The Court: I am intrigued by the premise to your argument. Suppose I need a hundred thousand dollars. I go and try to rob ten banks and each time I go I can’t get any money. Is my intended loss — are you saying my intended loss is only a hundred thousand dollars even though I tried to rob a hundred thousand dollars ten times?
Mr. Willstatter: This is not a bank robbery....
The Court: ... I don’t buy the premise. Every single time he unsuccessfully sought to use the card on that occasion he intended a six hundred dollar loss. You aggregate those, those are separate acts. I see nothing in this guideline that says simply because he’s unsuccessful and tries again we should only count his intent once.
Mr. Willstatter: Well, respectfully, the reason I think that the guidelines say that is because the guidelines focus on the intended loss.
The Court: Right.
Mr. Willstatter: The defendant’s intent was to get the six thousand dollars in the case of the Heenan card.
The Court: How many times did he bear that intent, how many separate occasions?
*272 MR. Willstatter: He bore it several times.
The Court: That’s what I am counting.
Sentencing Tr. at 8-11.
Under the district court’s view, when combined with other losses occasioned by the fraud perpetrated by Ravelo and his co-conspirator, Ravelo’s intended loss with respect to the Heenan and Wang cards put the total loss for Guidelines purposes over the $70,000 mark, requiring an 8-point upward adjustment. Under Ravelo’s view, the total loss was more than $30,000 but not greater than $70,000, requiring only a 6-point upward adjustment.
We have considerable doubt about some aspects of the district court’s approach, as we understand it, at least in the abstract. If a person seeks to use a credit card fraudulently to draw down what he or she thinks to be the maximum cash-advance limit on the card, we doubt that the number of attempts it turns out he or she must make to obtain the funds can affect what the person intends to gain and what he or she correspondingly intends the victim to lose: the card’s limit. If Ravelo knew, for example, that the Heenan card had a $6,000 maximum cash-advance limit and it took him ten tries to obtain that $6,000, we do not understand why the loss he intended must necessarily be assessed at ten times what it would have been had he struck paydirt on his first attempt. Had Ravelo been attempting to sell the fraudulent card rather than trying to obtain a cash advance on it, surely the fact that he was unable to complete a transaction until his tenth approach to a prospective buyer would not mean he necessarily intended to impose a loss ten times the amount had he sold the card to his first prospective buyer. The number of attempts required to complete a crime may reflect at most the criminal’s level of competence at the crime attempted, particularly when the repeated attempts occur within a relatively short period of time. It would seem odd at best to read the Guidelines to the contrary, requiring a sentence the severity of which varies inversely with the skill of the perpetrator.[4]
Whatever our concerns in the abstract, however, the concrete question is not before us. By letter dated the day before Ravelo’s sentencing hearing, the government put Ravelo on notice that it was the government’s position that the evidence did not support the conclusion that he had an intention of stopping at the credit limits of the cards.[5] Ravelo argued *273 at the hearing that he was chargeable only with an intended loss in the amount of the cash-advance limits of the credit cards. But Ravelo, despite the ample opportunity he had to do so, offered no direct evidence at the hearing or elsewhere as to his knowledge or belief regarding the credit-card cash-advance limits, his intent to constrain the amount of loss he caused to those limits, or whether the limits were in fact in the amounts he claims.
Ravelo suggests that the district court should nonetheless have drawn those inferences. For support, he points to the fact that the district court was apparently aware that he had made repeated attempts to withdraw amounts approximating the cash-advance limits on the Heenan and Wang cards. Sentencing Tr. at 9; Appellant’s Br. at 19. But while that might suggest that Ravelo knew the cash-advance limits of those cards, his attempts to obtain funds in amounts approximating those limits do not necessarily tend to establish that, had he been successful in one of those attempts, he would not have made further repeated attempts to use the relevant card. In the absence of direct evidence of the kind described above, it would be speculative to conclude from Ra-velo’s assertions regarding cash-advance limits of the cards that he intended to impose a total loss no greater than those limits.[6]
Finally, the fact that it would have been impossible for Ravelo to have drawn down more than $6,600 on the Heenan and Wang cards does not matter. The relevant loss amount is the “pecuniary harm that was intended to result from the offense ... including] intended pecuniary harm that would have been impossible.” U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) (emphasis added). The district court’s finding that Ravelo’s intended loss included all of his attempts to draw down money on the credit cards even though it was in fact impossible for him to have drawn down more than the actual cash-advance limit of the cards is therefore not clearly erroneous on this score.
CONCLUSION
For the foregoing reasons, the judgment of conviction and sentence of the district court is hereby affirmed.

. Neither party provides, and the record does not disclose, the details of Ravelo’s alleged state credit card fraud or of the proceedings following his arrest and questioning. According to the government, the prosecution arising therefrom "was resolved separately from the federal prosecution against Ravelo for credit card fraud.” Government’s Br. at 4 n.2.

. The statute reads in relevant part:
§ 1959. Violent crimes in aid of racketeering activity
(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—
(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of [sic] under this title, or both.
18 U.S.C. § 1959(a) (footnote omitted).

. We note that, as a result of this decision by the district court, Ravelo received concurrent sentences on the three charged crimes. This appears to be contrary to 18 U.S.C. § 3147, which requires that a sentence imposed for a crime committed while a defendant is released on bail "shall be consecutive to any other sentence of imprisonment.” The government has not cross-appealed seeking to raise this issue. We therefore do not consider it.

. It is true that "each of the defendant's attempts to defraud constitutes a separate and distinct violation of the law,” as Judge Raggi emphasizes in her concurrence in the judgment. Infra at 274. We do not see, however, how this general observation bears upon our interpretation of the words "intended loss.” The information at issue here, 02-CR-1166(JG), charged Ravelo with a single offense, that he "did knowingly and with intent to defraud traffic in and use one or more unauthorized access devices, to wit: credit cards and credit card account numbers, in a manner affecting interstate commerce, and by such conduct obtain things of value aggregating $1,000 or more.” The sentence for that offense therefore depends on "the pecuniary harm that was intended to result from the [one] offense.” U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). Had Ravelo proven that his intent was to make as many attempts as necessary to steal what he thought to be the applicable cash-advance limit on the relevant cards, and no more, we are unable to find authority in the text of the Guidelines or the application notes that would permit a court to sentence him based not upon this intended amount, but upon the number of attempts.

. Given Ravelo's free-wheeling use of the credit cards to obtain expensive items such as cars, computers, jewelry and $30,000-$40,000 in cash, it seems unlikely that he would have limited himself to a certain sum of money as to each card, especially such a small amount as $600 in the case of the *273 Wang card. There simply is no basis in the record for finding that Ravelo would not have continued to withdraw sums of cash from either or both credit card[s], had he been successful during any of these attempts. Accordingly, he should be held accountable for each attempted withdrawal.
Letter to the district court from Assistant United States Attorney Pamela K. Chen dated March 13, 2003, at 5.

. Other circuits have adopted similar approaches in analogous circumstances. See United States v. Miller, 316 F.3d 495, 504-05 (4th Cir.2003) (holding that the district court did not abuse its discretion in determining, where a defendant who pled guilty to mail fraud for over-billing insurers introduced no evidence that he actually intended to bill Medicare and Medicaid only as much as was provided in a government-established fee schedule, that the actual amounts billed constituted the intended loss); United States v. Geevers, 226 F.3d 186, 194 (3d Cir.2000) ("[In calculating the intended loss in a prosecution for check kiting], the face value of the deposited checks is not to be mechanically assumed to be the intended loss.... [However, absent other evidence,] a sentencing court may consider [face value] as sufficient evidence that it was the intended loss.”).