**Howard THALER, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Case No. 08–CV–110 (KMK).**

United States District Court, S.D. New York.

Nov. 19, 2009.

Opinion Denying Reconsideration Jan. 28, 2010.

Inga L. Parsons, Esq., Law Office of Inga L. Parsons, Marblehead, MA, for Petitioner.

Elliott B. Jacobson, Esq., U.S. Attorney's Office, White Plains, NY, for Respondent.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

In 2005, Howard Thaler ("Petitioner") was convicted, following a jury trial before Judge Charles L. Brieant, Jr., of nine substantive counts of mail fraud, wire fraud, and making false statements and one count of conspiracy to make false statements and commit mail fraud, all in connection with a series of real estate transactions. After the judgment of conviction was affirmed on direct appeal, Petitioner moved, pro se, to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255 ("Section 2255"). After allowing Petitioner's current counsel to supplement Petitioner's pro se Section 2255 submissions, Judge Brieant denied the petition and declined to issue a certificate of appealability. Petitioner moved in the Court of Appeals for a certificate of appealability ("COA"), and now moves in this Court for leave to amend his petition. The Government opposes this motion on grounds of futility and undue delay. The Court of Appeals has deferred decision on Petitioner's motion for a COA pending this Court's ruling on Petitioner's present motion for leave to amend. For the reasons discussed below, Petitioner's motion for leave to amend is denied.

## I. Background

### A. Petitioner's Conviction and Sentence

Petitioner, a disbarred lawyer, was charged in a fourteen-count superseding indictment ("Indictment") filed on October 24, 2005. (Superseding Indictment, *United States v. Thaler,* No. 04–CR–1204 (Dkt. No. 23).) On December 1, 2005, a jury found Petitioner guilty of ten counts: one count of conspiracy, in violation of 18 U.S.C. § 371; four counts of mail fraud, in violation of 18 U.S.C. § 1341; one count of wire fraud, in violation of 18 U.S.C. § 1343; two counts of making false statements, in violation of 18 U.S.C. § 1001; and two counts of making false statements, in violation of 18 U.S.C. § 1010.

At sentencing, on March 9, 2006, Judge Brieant stated that "there's been more than sufficient paper submitted by both sides in the case concerning the sentence and particularly concerning the issues of the guideline computation." (Sentencing Tr. ("S. Tr.") 22, *United States v. Thaler,* No. 04–CR–1204 (S.D.N.Y. Mar. 9, 2006).) Judge Brieant concluded that "the guideline[s,] as computed in the presentence report[,] are essentially correct" and that "the total harm to the victims for purposes of guideline computation clearly exceeds" the $200,000 threshold that "justif[ies] the twelve point loss enhancement" recommended by the Probation Department's Presentence Investigation Report ("PSI"). (*Id.*) The PSI, applying the 2005 Sentencing Guidelines, noted that Petitioner "caused total actual losses of $358,386.32," and thus merited a twelve-point increase in the offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(G). (PSI ¶¶ 33, 40, 43.) This conclusion was based on, inter alia, the following findings:

First, Petitioner caused an actual loss of $80,000 to Georgina Sosa. (*Id.* ¶¶ 24a, 33.) On July 20, 1999, Petitioner, "using a cor-

porate entity he had set up for this purpose—Hathone Corp.—bought the residence at 175 Orchard Street, Yonkers, N.Y. . . . for $160,000 and sold it to Georgina Sosa the very same day for $240,000." (*Id.* ¶ 24a.) Petitioner, "who acted as Sosa's attorney at the closing, in violation of his fiduciary duty to her as her lawyer and as her agent, never disclosed to her that he was Hathone Corp. or that Hathone Corp. had just purchased the home for $160,000." (*Id.*) Thus, Petitioner "defrauded Sosa of $80,000," i.e., "the difference between what he bought the property for [ (]$160,000) and what he sold it to her for ($240,000)." (*Id.*)

Second, Petitioner caused an actual loss of $35,000 to Gilbert Richardson. (*Id.* ¶¶ 24a, 33.) "In the summer of 2000, Gilbert Richardson was attempting to sell a home at 3642 Bronxwood Avenue, Bronx, N.Y. as well as an adjacent building lot at 900 East 215th Street." (*Id.* ¶ 24e.) Petitioner "was recommended to Richardson as an attorney who could represent him on the sale." (*Id.*) Richardson was made to believe that he would be selling both properties to a woman named Alicia Trail. (*Id.*) Prior to closing of the sale from Richardson to Trail, Petitioner had arranged to "steal the lot" from Richardson at the closing and then sell it to a third party, Hector Robinson, for $35,000. (*Id.*) At the September 11, 2000 closing, Petitioner, "act[ing] as Richardson's attorney, directed Richardson to sign papers deeding the lot to B-30 Corporation," a company owned by Petitioner and his partner; two days later, Petitioner sold the lot to Robinson for $35,000, as previously agreed. (*Id.*) Petitioner "violated the fiduciary duty he owed to Richardson as Richardson's lawyer and agent by failing to: 1) explain to Richardson that the papers he was directing Richardson to sign meant that Richardson was effectively giving away the lot for nothing[;] 2) that Richardson was giving the lot to a company owned in part

by [Petitioner;] and 3) that [Petitioner] had a pre-existing deal to sell the lot . . . for $35,000," and thus defrauded Richardson of $35,000. (*Id.* (footnote omitted).)

Third, Petitioner caused an actual loss of $165,000 to the estate of Herbert Best (the "Best Estate"). (*Id.* ¶¶ 24f, 33.) At the time of his death in 1997, Herbert Best had title to "an attached home at 2917 Tenbroeck Avenue, Bronx, NY." (*Id.* ¶ 24f.) In 1999, Petitioner, "profess[ing] to represent Herbert Best," called a cousin of Best's deceased wife, who at the time was living on the property and making mortgage payments, and told her that "she would have to vacate the premises." (*Id.*) The cousin "stopped making the mortgage payments" and "moved out," and the house was foreclosed. (*Id.*) Petitioner's partner then "bought the judgment of foreclosure," Petitioner "procured a buyer for the home," and Petitioner and his partner "paid a shill to act as the dead Herbert Best and to sign the necessary papers" at the closing of the sale of the property on September 1, 2000. (*Id.*) The buyer paid $165,000 for the house; the proceeds, after closing costs, were shared by Petitioner and his partner. (*Id.*) As "Herbert Best has living relatives who by law own the home in question," Petitioner defrauded the Best Estate. (*Id.*)

Fourth, Petitioner caused an actual loss of $33,428.58 to Columbia Equities ("Columbia") and an actual loss of $44,957.74 to Indymac. (*Id.* ¶¶ 24d, 33.) In August 2000, Petitioner provided $23,000 to be used for a fraudulent gift to Nancy Smith so that Smith could get a loan to purchase a house. (*Id.* ¶ 24d.) Based on a "loan application falsely stat[ing] that [Smith had] received a gift in the amount of $45,000," Columbia loaned Smith the money to buy the house. (*Id.*) Columbia subsequently sold the obligation to Indymac; the loan then became nonperforming, and

Indymac sold it to a third entity at a loss of $78,386.32, of which Indymac recouped $33,428.58 from Columbia. (*Id.*)[1]

At sentencing, Judge Brieant addressed Petitioner's written objections to the PSI, which included objections to the loss calculations as to Sosa, Richardson, the Best Estate, and Columbia. (Letter from Susan C. Wolfe, Esq., to David M. Sternberg, U.S. Probation Office (Feb. 13, 2006) ("PSI Obj.") 3.)

First, Petitioner asserted that Sosa "did not sustain losses in the amount of $80,000" (*id.*) for the following reasons:

> [Petitioner] upgraded the heating system from electric to gas at his own expense. Moreover, Sosa could not have purchased the house from the seller for $160,000; thus, attributing to her a loss of $80,000 is purely speculative. While [Petitioner] may have negotiated a favorable deal for himself ..., there is no evidence that Sosa paid more than the market value for the property. Sosa was able to purchase and now owns a home that she could not have had without [Petitioner's] assistance.

(*Id.* at 1.)[2] Judge Brieant held that Petitioner's objection to the PSI's characterization of Petitioner's defrauding of Sosa "ha[d] no particular significance ... in the guideline computations" and therefore "decline[d] to rule on it." (S. Tr. 48.) As to Petitioner's objection to the $80,000 loss amount, Judge Brieant stated that the objection was "covered to the extent that the losses were more than $200,000 which is sufficient to support the guideline computation." (*Id.*)

Second, Petitioner objected that Richardson "did not sustain losses in the amount of $35,000" (PSI Obj. 3) for the following reasons:

> The evidence at trial indicated that Richardson had attempted to sell the lot and house separately in a previous deal not involving [Petitioner] and that deal never closed. In addition, Richardson testified that he would have sold the property by itself before he met [Petitioner] had there been any buyers, but there were none. There were squatters on the property and [Petitioner] took on the expense of removing them. Richardson testified that he was desperate to get rid of the properties, either separately or together, because he was behind in his payments on two mortgages for the properties. Therefore, he was not defrauded of $35,000 because he wanted to get rid of both properties so as not to further fall behind on his mortgage payments.

(*Id.* at 2.)[3] In the Addendum to the PSI, the Probation Department disagreed: "[Petitioner] was convicted of defrauding Richardson.... According to Hector Robinson, he bought the lot from [Petitioner] after [Petitioner] essentially stole it from Richardson. The fact that [Petitioner] promised to help Robinson get rid of the squatters ... after he purchased the lot from [Petitioner] is irrelevant...." (PSI 29.) Judge Brieant concluded that Petitioner's objection "ha[d] no merit for the reasons noted [in the PSI] by the [probation] officer." (S. Tr. 48.)

---

**1.** On appeal, the Government acknowledged that the total loss from the Smith loan was $49,263.12, because Indymac's calculation included lost interest and a premium it paid for the loan, amounts that are excluded for loss calculation purposes under U.S.S.G. § 2B1.1. *See* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n. 3(D)(I) (2005).

**2.** Petitioner appears not to have quantified how much he supposedly spent on the heating system.

**3.** Petitioner did not demonstrate how much it cost him to deal with the squatters.

Third, Petitioner objected that "[t]he Best [E]state did not suffer any losses" because "[t]he house was already in foreclosure and it is pure speculation to assume that the Best [E]state would have received anything out of a foreclosure sale," and because "the Best [E]state was never even aware ... that Herbert Best owned a home." (PSI Obj. 2, 3.) Judge Brieant stated that this objection had "no merit for the reasons stated by this Court in its analysis of the restitution issue in connection with the Herbert Best property." (S. Tr. 48.) In awarding restitution to the Best Estate, Judge Brieant rejected Petitioner's argument that " 'there's no reasonable probability that the Best [E]state would ever have been located and received any of the proceeds had [Petitioner] never become involved,' " stating, "that's not necessarily so." (Id. at 32.) Judge Brieant "reject[ed] ... as ... totally unfounded" Petitioner's argument that "the Best heirs would have been left out in the cold forever, even if [Petitioner] had not entered the scene." (Id. at 33.)

Fourth, though Petitioner apparently conceded that he was responsible for the $44,957.74 loss suffered by to Indymac (PSI Obj. 4 (stating that "[t]he loss did not exceed $44,957.74")), he objected that Columbia's loss of $33,428.58 was "paid in settlement ... based upon [Columbia's] failure to verify the information contained in the loan application" and thus "was due to the company's own admitted negligence" (id. at 3). Petitioner further objected to the statement that he "participated in a fraud on Columbia," arguing that "[h]e did not participate in making the loan application or otherwise supplying information to the mortgage company." (Id. at 2.) Judge Brieant rejected these objections, ruling that it was "absurd to claim that [Columbia's] loss [was] due to its own negligence in not uncovering the fraud" and dismissing Petitioner's claim of non-participation. (S. Tr. 49.) Petitioner also

stated that Indymac sold the mortgage at a loss of $75,488.49, not $78,386.32. (PSI Obj. 2.) Judge Brieant did not specifically address this last contention, though he ruled that the objection of which it was a part had "no merit." (S. Tr. 48.)

Based on his conclusion that the loss amount was over $200,000, Judge Brieant found that the applicable Guidelines range was 97 to 121 months' imprisonment. (Id. at 54.) However, he imposed a sentence of 84 months' imprisonment. (Id. at 55–56.)

Petitioner surrendered on June 8, 2006. The Second Circuit affirmed the judgment of conviction, see United States v. Thaler, 229 Fed.Appx. 7 (2d Cir.2007), and the Supreme Court denied certiorari, see Thaler v. United States, 552 U.S. 1010, 128 S.Ct. 554, 169 L.Ed.2d 374 (2007). In summarily affirming the conviction, the Second Circuit specifically upheld Judge Brieant's finding that Petitioner's "fraudulent acts caused a loss between $200,000–$400,000." Thaler, 229 Fed.Appx at 10.

## B. Petitioner's Section 2255 Motion

On January 7, 2008, Petitioner, pro se, filed a Section 2255 petition for a writ of habeas corpus. Petitioner's motion, dated December 12, 2007, only alleged ineffective assistance of counsel "in failing to pursue offered plea." (Section 2255 Pet. 5.) According to Petitioner, his former attorney, John Kase, now a Nassau County Court judge, "failed to furnish constitutionally adequate assistance" when, in October 2004, after the Government withdrew its original indictment, Petitioner "suggested [to Kase] that it might be wise to engage in some sort of discussion with the government to head off another indictment, but Kase said ... that we should wait and 'see what kind of case they bring.' " (Id. Attach. A, at unnumbered 1, 2.) Petitioner asserted: "I had wanted to resolve the case prior to the second indictment, as I

know from my experience as an attorney, that is the best time to reach an agreement." (*Id.* at unnumbered 2.)

After briefing on the motion was complete, Petitioner, having retained current counsel, moved to "amend and supplement the previously filed *pro se* pleadings in this habeas corpus matter." By order of March 7, 2008, Judge Brieant consented to consider a further submission by Petitioner, and Petitioner subsequently filed a "Supplemental Reply in Support of Petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255," which argued in greater detail that the representation of Petitioner with respect to plea negotiations was ineffective.

By order of May 23, 2008, Judge Brieant denied the petition as having "no merit" and "decline[d] to issue a Certificate of Appealability because the issue [was] fact-intensive presenting no significant legal issue worthy of adjudication." (Mem. & Order May 22, 2008, at 8.) Petitioner subsequently filed a notice of appeal in the Second Circuit, and moved in that court for a COA.

On November 3, 2008, Petitioner filed the instant motion, seeking leave to amend his petition, "pursuant to 28 U.S.C. § 2242, Rule 12 of the Rules Governing Section 2255 Proceedings, Rule 15(a) of the Federal Rules of Civil Procedure and the inherent and supervisory powers of this Court." (Pet'r Mem. of Law in Supp. of Mot. for Leave to Amend ("Pet'r Mem.") 2.) In support of this motion, Petitioner asserts that, among others, the Second Circuit's decision in *United States v. Confredo*, 528 F.3d 143 (2d Cir.2008), issued on June 10, 2008, "materially change[s] the interpretation, construction and application of *Application Note 7(b)* to U.S.S[.]G. § 2F1.1," and "conclusively establishes that the loss calculation methodology applied by the District Court at the time of Petitioner's sentence[] was incorrect." (Pet'r Mem.

20–21.) The Government opposes the motion to amend, asserting that it is "the product of undue delay." (Gov't Mem. of Law in Opp'n to Def.'s Mot. for Leave to Amend ("Gov't Mem.") 48.) In the alternative, the Government argues, the motion should be denied as futile, because resentencing in light of *Confredo*, and other cases cited by Petitioner, "would not result in an alteration of the loss amount," and because Petitioner "received a non-guidelines sentence well below the low end of the guidelines as calculated." (*Id.* 50.)

The case was reassigned to this Court on December 1, 2008. By order of February 23, 2009, the Court of Appeals deferred decision of Petitioner's motion for a COA "until the district court denies the pending motion to amend or indicates that it is 'inclined to grant' the motion."

## II. Discussion

Petitioner contends that his application is "properly made as a motion to amend Petitioner's initial filing, rather than as a 'second or successive' petition within the meaning of 28 U.S.C. § 2255(h)" (Pet'r Mem. 17), and the Government does not dispute this assertion.

### A. Standard of Review

 "A motion to amend a habeas petition is analyzed under the standards set forth in Federal Rule of Civil Procedure 15(a)." *Feliciano v. United States*, Nos. 01–CV–9398, 95–CR–941, 2009 WL 928140, at *2 (S.D.N.Y. Mar. 30, 2009); *see also Ching v. United States*, 298 F.3d 174, 180 (2d Cir.2002) ("We have previously decided that the application of Fed. R.Civ.P. 15 to habeas petitions and § 2255 motions would not frustrate the [Antiterrorism and Effective Death Penalty Act]'s goals, even if the motion to amend is brought late in the proceedings."). "[I]t is within the sound discretion of the district court to grant or deny leave to amend."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007). "The court should freely give leave [to amend] when justice so requires," Fed.R.Civ.P. 15(a)(2), but Rule 15(a) "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir.2008); *see also Henry v. United States*, Nos. 00–CV–666, 94–CR–215, 2000 WL 1825402, at *3 (D.Conn. Nov. 21, 2000) (denying, as futile, leave to amend Section 2255 petition).

### B. Undue Delay

■ The Government contends that Petitioner's motion for leave to amend his petition should be denied on the basis of undue delay in seeking to amend. The Government argues that, because the instant motion is "based principally" on the Second Circuit's decision in *Confredo*, which was issued on June 10, 2008, Petitioner delayed unduly in moving for leave to amend on November 3, 2008. (Gov't Mem. 48–49.) According to the Government, "there is simply no excuse for current, privately retained habeas counsel's delay—from June through November—in filing the instant motion." (*Id.* at 49.) In response, Petitioner asserts that the delay was reasonable, citing counsel's need "to determine whether the issue is indeed worth pursuing," and Petitioner's need "to decide whether to go forward with the expense of such filings which can take time particularly when counsel is away and involved in other matters during a considerable part of this period and Petitioner is incarcerated." (Pet'r Reply Mem. in Supp. of Mot. for Leave to Amend ("Pet'r Reply Mem.") 4.)

The Court, in its discretion, finds that Petitioner's motion for leave to amend should not be denied on account of undue delay. The Government has not referred the Court to any case in which a finding of undue delay has been based on a time lapse of fewer than five months, and the Court is unaware of any such case. The Court accepts Petitioner's Counsel's reasons for the timing of the motion and her diligence in preparing it, and therefore concludes that it was entirely reasonable for Petitioner to file the instant motion when she did. *See Barbarelli v. Verizon Commc'ns Inc.*, No. 05–CV–6759, 2008 WL 80725, at *1 (S.D.N.Y. Jan. 7, 2008) (allowing defendant to amend its answer to add a statute of limitations defense, finding that plaintiff's argument that "defense counsel should have spotted the statute of limitations issue four months earlier ... d[id] not amount to a showing of undue delay"); *cf. Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101–02 (2d Cir.2002) (affirming district court's denial of leave to amend where plaintiff's "motion for leave to amend came over four years after she filed her original complaint and over three years after the close of discovery"); *McCarthy*, 482 F.3d at 202 (affirming district court's denial of leave to amend where plaintiffs "sought to amend their complaint after an inordinate delay," by which time "discovery had closed, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint"). Moreover, because Petitioner has been incarcerated throughout the relevant time period, there is no viable suggestion of bad faith or strategic delay.

### C. Futility

■ The Government asserts, in the alternative, that Petitioner should not be granted leave to amend because his proposed amendment is futile. Specifically, the Government argues that the recent decisions cited by Petitioner—*Confredo, United States v. Leonard*, 529 F.3d 83 (2d

Cir.2008), and *United States v. Rutkoske,* 506 F.3d 170 (2d Cir.2007)—do not cast doubt on the loss calculation relied upon by Judge Brieant at sentencing and affirmed by the Second Circuit, and that even if those cases render incorrect the loss calculation, any error was harmless because Judge Brieant imposed a non-Guidelines sentence.

### 1. Cases Cited by Petitioner

Petitioner argues that *Confredo, Leonard* and *Rutkoske* dictate that Judge Brieant's loss calculation was incorrect, rendering Petitioner's sentence procedurally unreasonable.

In *Confredo,* the district court, in calculating the loss amount in a case of bank fraud, had "ruled that ... the 'intended loss' was the combined face value of all the loans for which [defendant's] customers had applied." *Confredo,* 528 F.3d at 148. The Second Circuit attributed the loss calculation decision, "at least in part," to the district court's view "that a presenter of fraudulent loan applications will be deemed as a matter of law to have intended a loss equal to the aggregate amount of the loans whenever the presenter is not the borrower." *Id.* at 150. The Second Circuit considered whether that view was consistent with Application Note 7 to U.S.S.G. § 2F1.1, as amended in 1991, which

> does not specifically provide a method for determining intended loss in a case ... where (a) no collateral is involved, and (b) the defendant is not a borrower but a preparer of fraudulent loan applications who claims to have expected that a number of loans would be denied and at least some portion of the loans granted would be repaid.

*Id.* at 151. The *Confredo* court held that, in such a case, "the defendant should have an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the loans." *Id.* at 152.

In *Leonard,* a securities fraud case, the district court had computed the loss amount "as equal to the entire cost of the securities sold by the [defendants], on the ground that the [victims] would not have invested" in the absence of defendants' misrepresentations. *Leonard,* 529 F.3d at 93. The Second Circuit "defer[red] to the district court's determination that the [victims] would not have purchased the investment had they known" the truth, but held that "this does not, in and of itself, mean that the securities the investors received ... were entirely without value," and concluded that "the district court erred in not deducting from the purchase price the actual value of the instruments." *Id.*

In *Rutkoske,* a securities fraud case, the district court had calculated the loss amount by "tak[ing] the losses sustained by ... customers ... as a result of their purchases and sales between January 1997 and July 29, 1999, and, as to unsold shares, us[ing] the difference between purchase price and value on July 29, 1999," despite the fact that the date July 29, 1999 "had no particular relevance to the offense conduct, and in fact was three months after the end of the charged conspiracy." *Rutkoske,* 506 F.3d at 178. The Second Circuit noted the Supreme Court's observation in *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), that, in a civil stock fraud case, "other factors [besides fraud], such as changed economic conditions, might also contribute to a stock's decline in price, and a plaintiff must prove that the misrepresentation proximately caused the economic loss." *Rutkoske,* 506 F.3d at 179 (internal citation omitted). "[S]ee[ing] no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in

which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence," the Second Circuit held that the district court's "basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in . . . share price requires a remand to redetermine the amount of the loss. . . ." *Id.* at 179–80.

### 2. Petitioner's Claims of Incorrect Loss Calculation

Petitioner argues that Judge Brieant erred in sentencing him based on his finding that there was more than $200,000 of actual loss; instead, Petitioner contends, the three Second Circuit's sentencing decisions described above dictate that there was *no* actual or intended loss. (Pet'r Mem. 33–34.)

First, Petitioner contends that the PSI's calculation of $80,000 loss to Sosa "is not supportable in the wake of *Ru[ ]tkoske, Confredo,* and *Leonard.*" (Pet'r Mem. 28.) Petitioner argues:

> Under a civil law scenario, there was no loss to Sosa because she received something of greater or equal value for her $240,000[,] a piece of property which was appraised at more than the purchase price. The fraud—Petitioner's failure to disclose that his company was the owner of the property and that he was not an attorney—was not a proximate cause of any loss on the part of Sosa ala [sic] *Ru[ ]tkoske.* Indeed, even if Sosa had testified that she would not have bought the property had she known these facts,

the Second Circuit requires that the value of what was receive[d] be deducted from the amount of the loss. *See Leonard,* 529 F.3d at 93. In the words of the Second Circuit, Sosa did obtain an interest in the property. *Id.*

(Pet'r Mem. 28.) The Government responds that Petitioner's actions in denying Sosa "the opportunity to purchase that house directly from the party from whom her 'attorney' (the [Petitioner]) purchased it that same day without his first having made any of the required disclosures, cost her, without question, $80,000." (Gov't Mem. 51.) In his reply, Petitioner states that "because the 'fair market value' of the property obtained by Sosa exceeded the amount she paid for it, no loss occurred." (Pet'r Reply Mem. 16.) [4]

*Rutkoske* and *Leonard* do nothing to undermine the PSI's conclusion that the loss amount was $80,000.[5] Petitioner's argument is not that some of Sosa's loss was not proximately caused by the offense conduct, but that Sosa suffered no loss at all, and so *Rutkoske* is inapposite. *Leonard* is likewise inapplicable; that case simply holds that a fraudulently induced purchase of certain assets does not cause loss equaling the entire purchase price if the assets actually have some value greater than zero. The PSI calculated Sosa's loss based on its finding that Petitioner violated his fiduciary duty to Sosa and fraudulently sold her a house for $80,000 more than the price at which he had bought it earlier that day—stealing an $80,000 profit that should have belonged to Sosa, if she

---

4. On this point, it bears noting that on his initial appeal, Petitioner made a similar-argument about the Sosa transaction to the one he makes here: "Ms. Sosa not only owns a home that has increased in value while she has lowered her mortgage payments, but she also receives rental income from the property," and therefore did not incur any loss. (Br. of Def.-Appellant Howard Thaler ("Appeal Br.")

46, *United States v. Thaler,* 229 Fed.Appx. 7 (2d Cir.2007) (No. 06–CR–1263).)

5. Petitioner, though referencing *Confredo,* offers no explanation as to how that decision in any way affects the Sosa transaction, and the Court fails to see how it does. Indeed, the loss attributed to Petitioner was for less than the transaction amount and was limited only to the excess price Sosa paid for the property.

had been represented by an honest attorney—not based on an assumption that Petitioner fraudulently induced Sosa to spend $80,000 on a supposedly worthless house. Thus, no matter how much more the house might have been worth than the purchase price Sosa paid, the evidence clearly supports the conclusion that Sosa paid $80,000 more for the house because of Petitioner's corrupt and fraudulent conduct, thus reducing Sosa's equity in the property by that amount.

Second, Petitioner contends that Judge Brieant erroneously rejected his objection to the PSI's finding that Gilbert Richardson suffered a loss of $35,000. Petitioner now reprises his argument that there was no loss to Richardson because Petitioner's fraud ultimately helped Richardson, arguing, without citation to any case law, that

> it is evident that Richardson was whole—more whole in fact than if Petitioner had not come onto the scene. He received more money than he would have if he had sold the property at his original selling price. Moreover, Richardson did not have to invest the time and money to get the property prepared for sale.... Under a civil law theory, Richardson would not be entitled to monies from [Petitioner]. Richardson actually received more money tha[n] he had initially been willing to take for the properties and cleared $2,000. Had he gone through with the sale prior to Petitioner's involvement he would not have cleared that profit and both properties would have been sold for less. Under no civil law theory would Richardson be

entitled to $35,000 which would be considered unjust enrichment.

(Pet'r Mem. 29–30.) [6] The Court is unable to see how *Rutkoske, Confredo,* or *Leonard* undermines Judge Brieant's, or the Second Circuit's, previous rejection of this argument, and, in fact, Petitioner's discussion of this transaction does not include any citation to these three cases. The lot was worth $35,000, and Petitioner violated his fiduciary duty to Richardson and took it from him for nothing. [7]

Third, Petitioner contends that Judge Brieant improperly rejected his objection to the PSI's conclusion that the Best Estate suffered a loss of $165,000. Petitioner renews his contention on appeal that "there is no reasonable probability that the Best Estate would *ever* have been located" (*Id.* at 30; Appeal Br. 50), despite its explicit rejection by Judge Brieant, who deemed "totally unfounded" Petitioner's argument that "the Best heirs would have been left out in the cold forever." (S. Tr. 33.) Petitioner also offers the argument that "[i]t is evident that the home had been abandoned, and more important in the wake of *Confredo[,]* Petitioner reasonably believed that it was abandoned." (Pet'r Mem. 30.) He made the same point on appeal, though obviously without citing to *Confredo.* (Appeal Br. 50.)

Assuming *arguendo* that *Confredo* changed the law to somehow make Petitioner's reasonable belief that the house had been abandoned newly relevant to the Guidelines loss calculation, Petitioner's claim is unavailing because it is inconsis-

---

6. Again, Petitioner made a similar claim in his original appeal of the judgment. (*See* Appeal Br. 49 ("[Richardson] was not in a position nor, according to his testimony, was he inclined to hold out for a better deal by selling the properties separately.").)

7. Because Petitioner has failed to quantify any value he created for Richardson by re-

moving the squatters, or otherwise, he has no basis on which to quibble with the $35,000 figure. *See United States v. Byors,* 586 F.3d 222, 225–26 (2d Cir.2009) (noting that the loss figure may be reduced by a defendant's expenditure only when that expenditure conferred value to the victims).

tent with both the jury's verdict and Judge Brieant's findings. Petitioner was convicted, under Count Eight of the Indictment, of having "wilfully[ ] and knowingly ... devise[d] ... a scheme to obtain $165,000 from the estate of a deceased individual." (Indictment ¶ 19.) And Judge Brieant, citing trial evidence, explicitly concluded that Petitioner did not believe that the property was abandoned, but rather that he and his co-conspirator understood that they were stealing it. Indeed, at sentencing, in response to Petitioner's argument "there was no evidence for a reason that [Petitioner or his co-conspirator] knew that Mr. Best had passed away," Judge Brieant responded: "I don't know what inference you draw from that. They knew that the person who attempted to close was not Mr. Best. *They knew they were engaged in thievery.*" (S. Tr. 21 (emphasis added).)[8] Put another way, the three cases Petitioner has relied on in seeking his amendment have nothing to do with his argument here. Instead, this is just a rehashing of factual assertions already rejected by Judge Brieant and the Second Circuit.[9]

Finally, Petitioner asserts that the PSI, in calculating the amount of loss in connection with the Columbia mortgage, "incorrectly determined that the amount of loss was the difference between what Indymac had purchased the mortgage for and the discounted sale price plus the lost interest." (Pet'r Mem. 32.) Petitioner argues:

This loss is not a correct application of the law on loss in the wake of *Confredo[ ] et[ ] al.* Foremost, it is evident that in supplying part of the funds for the downpayment there was no intent to defraud anyone the amount of the loan. Even if there had been, any fraud (intended by Petitioner or otherwise) was *not* the proximate cause of the loss to Indymac. For reasons that are not clear in the record, Indymac made what appears to be a business decision ... to take a loan which was secured by a property which was objectively valued between $245,000 and $300,000 and well above the purchase price and discount it.

Put another way, the actual loss realized by Indymac and as a result of indemnification Columbia Equities was not due to the fraud but due to a business decision.... Under any civil loss application Indymac is not entitled to compensation from Petitioner as Indymac's loss was its own doing—not caused by the fraud. There should never have been an actual loss; instead there should have been an actual gain—that Indymac chose to take a loss was not a result of the fraud but a result of a business decision.

Furthermore, as to intent, if Petitioner is lending money for a loan for property that is fully collateralized, the intended fraud amount is zero—less than zero in fact because the value of the property was more than the loan. Petitioner ... knew well that the property's value was greater than the loan and never intended Indymac to be under collateralized. As a result the $78,396.02 used by the Probation Department as the amount of loss (which included interest as well) must be deducted from the guidelines calculation.

---

8. Moreover, the record demonstrates that Petitioner falsely claimed to represent Herbert Best when he called a family relative to tell her that she was "fraudulently" living in the Best house. (PSI ¶ 24f.)

9. It is worth noting that there is evidence in the trial record that there had been a mortgage of approximately $35,650 on the property in the late 1970s, and that there was a judgment at foreclosure for $22,907.98 plus interest in favor of a lender. (Appeal Br. 50.) At worst, that would leave in excess of $130,000 in loss amount.

(*Id.* 32–33.) In other words, whereas at sentencing Petitioner contested Columbia's loss as due to Columbia's negligence in discovering the fraud, but did not contest the Indymac loss, he now argues (as he did, unsuccessfully, on appeal) that the loss suffered by Indymac (and passed on to Columbia) was not intended by Petitioner and in any event was proximately caused only by Indymac's own business decision and not by Petitioner's fraud. (Appeal Br. 51–52 ("For whatever reason, Indymac made a business decision to sell the loan at a discount. . . .").) These assertions are without merit. The calculations in this case are of actual—not intended—loss, and thus Petitioner's intent is not dispositive. Petitioner's contention that his conduct did not proximately cause the losses is likewise without support, and he makes no effort to explain how that contention is consistent with his apparent concession at sentencing that he caused $44,957.74 in losses to Indymac. And, even if Petitioner is right about this transaction, it would not have changed Judge Brieant's conclusion that the total loss amount was between $200,000 and $400,000, as the losses rung up in the Sosa, Richardson, and Best transactions easily exceeded $200,000.[10]

In sum, Petitioner raises no colorable claim that the holdings of *Rutkoske*, *Confredo*, and *Leonard* render incorrect Judge Brieant's conclusion at sentencing (or the Second Circuit's on appeal) that the loss attributed to Petitioner was greater than $200,000. Accordingly, the Court will exercise its discretion to deny Petitioner's motion for leave to amend, on the ground that amendment would be futile. The Court, therefore, need not consider the Government's alternative contention that Judge Brieant's decision to impose a below-Guidelines sentence renders any error in the loss calculation harmless.

### III. Conclusion

For the reasons stated herein, Petitioner's motion for leave to amend is denied. The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 9).

SO ORDERED.

### ORDER

In 2005, Howard Thaler ("Petitioner") was convicted, following a jury trial before Judge Charles L. Brieant, Jr., of nine substantive counts of mail fraud, wire fraud, and making false statements and one count of conspiracy to make false statements and commit mail fraud, all in connection with a series of real estate transactions. After the judgment of conviction was affirmed on direct appeal, Petitioner moved, pro se, to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255 ("Section 2255"). After allowing Petitioner's current counsel to supplement Petitioner's pro se Section 2255 submissions, Judge Brieant denied the petition and declined to issue a certificate of appealability ("COA"). Petitioner moved in the Court of Appeals for a COA, and then moved in this Court for leave to amend his petition. The Court of Appeals deferred its decision on Petition-

---

**10.** Petitioner cannot escape the actual losses to Sosa and Richardson of $80,000 and $35,000 respectively (a total of $115,000). Even if the loss to the Best Estate of $165,000 should be reduced by the mortgage that existed on the premises in the 1970s (which is obviously too large a reduction and larger than the foreclosure amount), that would put the actual loss to the Best Estate at $129,350, bringing the total actual loss to $244,350. In the alternative, under U.S. S.G. § 2B1.1 cmt. n. 3(B), if the total loss is measured by Petitioner's financial gain, it would amount to approximately $215,000 ($58,847 from Sosa, $35,000 from Richardson, $115,928 from the Best Estate, and $6,500 from the Smith Loan). (Gov't Ex. 40, 44, 58, 61, 62, 150, 201, *United States v. Thaler*, No. 04–CR–1204; Trial Tr. 168–69, *United States v. Thaler*, No. 04–CR1204 (S.D.N.Y. Nov. 1, 2005).)

er's motion for a COA pending this Court's ruling on Petitioner's motion for leave to amend. This Court subsequently denied Petitioner's motion for leave to amend on the grounds that the proposed amendments were futile. (Op. & Order (Nov. 19, 2009) (Dkt. No. 16.) ("Op.")) Petitioner now moves for reconsideration of the denied motion for leave to amend, pursuant to Fed.R.Civ.P. 59(e). (Dkt. No. 17.) The Court assumes familiarity with the factual background of this case. An account can be found in the Court's previous opinion denying his Motion to Amend the Petition. (Op. 2–10.) For the reasons discussed below, Petitioner's Motion for Reconsideration of his motion to amend is denied.

## I. Discussion

### A. Standard of Review

■ " 'The standards governing a motion to alter or amend judgment pursuant to Rule 59(e) and motions for reconsideration or reargument pursuant to Local Rule 6.3 are the same.' " *Jain v. Secs. Indus. & Fin. Mkts. Ass'n*, No. 08–CV–6463, 2009 WL 4059171, at *1 (S.D.N.Y. Nov. 18, 2009) (quoting *Word v. Croce*, No. 00–CV–6496, 2001 WL 755394, at *2 (S.D.N.Y. July 5, 2001)). "A motion for reconsideration or re-argument shall be granted only if the court has overlooked 'controlling decisions or factual matters that were put before it on the underlying motion and which, had they been considered, might have reasonably altered the result before the court.' " *Mikol v. Barnhart*, 554 F.Supp.2d 498, 500 (S.D.N.Y.2008) (quoting *Greenwald v. Orb Commc'ns & Mktg., Inc.*, No. 00–CV–1939, 2003 WL 660844, at *1 (S.D.N.Y. Feb. 27, 2003)) (internal quotation and ellipse omitted); *see also* Local Civ. R. 6.3. Motions for reconsideration are not opportunities to repeat arguments that have been fully considered and rejected by the Court. *See Mikol*, 554 F.Supp.2d at 500; *Dellefave v. Access Temps., Inc.*, 99–CV–6098, 2001 WL 286771, at *1 (S.D.N.Y. Mar. 22, 2001). "Where the movant fails to show that any controlling authority or facts have actually been overlooked ... or attempts to advance new facts, the motion for reconsideration must be denied." *Mikol*, 554 F.Supp.2d at 500; *see also Brown v. Barnhart*, No. 04–CV–2450, 2005 WL 1423241, at *1 (S.D.N.Y. June 16, 2005).

■ A party may seek, and the Court construes Petition's motion as seeking, relief from a final judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2). However, "Rule 60(b) provides 'a mechanism for extraordinary judicial relief available only if the moving party demonstrates exceptional circumstances,' and relief under the rule is discretionary." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir.2009) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir.2008)) (internal citations and brackets omitted); *see also Chance v. Fabrizi*, 331 Fed.Appx. 842, 843 (2d Cir.2009) (summary order). "Accordingly, the moving party may not 'advance new facts, issues or arguments not previously presented to the Court,' " unless Fed R. Civ. P. 60(b)(2) applies. *Brown*, 2005 WL 1423241, at * 1 (quoting *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.*, 768 F.Supp. 115, 116 (S.D.N.Y.1991)); *see also Chance*, 331 Fed.Appx. at 843 (" 'Rule 60(b)(2) provides relief when the movant presents newly discovered evidence that could not have been discovered earlier and that is relevant to the merits of the litigation.' " (quoting *Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir.2003)) (emphasis removed)).

### B. Breach of Fiduciary Duty as Basis of Liability

■ Petitioner makes two related arguments urging that this Court erroneously

calculated the loss amounts based on a theory of breach of fiduciary duty. First, Petitioner argues that, with respect to Sosa and Richardson, the loss calculations cannot be premised on a breach of fiduciary duty because that was not the grounds for Petitioner's conviction. (Mem. of Law in Supp. of Pet'r's Mot. for Recons. ("Pet'r Mem."), at second unnumbered page.) Second, Petitioner argues that even if the Court could consider Petitioner's breach of fiduciary duty, the duties breached were not the cause of the loss to Petitioner's victims. (*Id.* at third-fourth unnumbered pages.)

Both of Petitioner's arguments are fatally undercut by the jury charge Judge Brieant gave at trial. First, Judge Brieant explained that the first element of mail fraud required that the Government prove beyond a reasonable doubt that the Petitioner defrauded his victims "by false and fraudulent pretenses, representations, or promises." (Trial Tr., *United States v. Thaler*, No. 04–CR–1204 (S.D.N.Y. Oct. 31, 2005) ("Tr.") 1782–83.) Judge Brieant then explained that "[t]he failure to disclose information may ... constitute a fraudulent representation if the defendant was under a legal duty or fiduciary obligation or contractual duty to disclose something to another person...." (*Id.* at 1784.) Continuing, Judge Brieant informed the jury that "an agent acting on behalf of a principal in a real estate transaction owes a duty of undivided loyalty to his principal ... [and] is not permitted to place himself in a position where his own interests could become adverse or antagonistic to his principal without full disclosure...." (*Id.* at 1785.) Furthermore, Judge Brieant explained, "[a]n attorney acting for a client or principal is ... an agent" and those obligations are "not affected by whether or not [the attorney] is licensed." (*Id.*) Summarizing, and focusing on the relevant victims, Judge Brieant instructed the jury that:

If you find that the government has proved beyond a reasonable doubt that Mr. Thaler did not disclose to Mr. Richardson that he was a principal or one of the owners of the B–30 Corporation which was buying the vacant lot, and that he also had an existing agreement to resell the vacant lot almost immediately to Hector Robinson for a larger amount of money, you may find, assuming he acted wilfully in doing so, that the government has proved that the defendant violated his fiduciary duty as an agent or attorney for Mr. Richardson....

If you find that the government has proved beyond a reasonable doubt that the property [purchased by Ms. Sosa] was then owned by the Hathone Corporation, and that Mr. Thaler did not disclose to Ms. Sosa that the property was actually owned by Hathone Corporation, and that he was a principal or stockholder of that company, and if he acted wilfully in doing so, then you may find that the defendant has violated his fiduciary duty as an agent or attorney for Ms. Sosa....

(*Id.* at 1786.)

These instructions make as plain as possible that Petitioner was convicted for violating his fiduciary duties to Sosa and Richardson. Petitioner may believe that these jury instructions were in error, whether because Petitioner disputes that he had a fiduciary duty, or because Petitioner believes that he could not be convicted on the basis of such a duty, but a motion for reconsideration of a denied motion for leave to amend a denied Section 2255 petition is the wrong forum in which to make those arguments. Indeed, the question of Petitioner's fiduciary duty was not raised in Petitioner's motion for leave to amend, and the Court is perplexed by Petitioner's raising it in this motion.

With regard to the Sosa transaction, Petitioner argues that "[a]lthough it is uncontested that there was a fiduciary duty, the fiduciary duty in this case did not extend to the duty of disclosure of ... what [Petitioner] paid previously for the property." (Pet'r Mem., at third unnumbered page.) Even if true, that argument is beside the point. Petitioner had an obligation, as Judge Brieant explained, to disclose that the property being sold was owned by Petitioner. Petitioner also had, as Judge Brieant further explained, a duty of loyalty that was clearly violated when Petitioner secretly acted as a property speculator in order to profit at the expense of his client.

### C. Petitioner's Other Arguments Regarding the Sosa and Richardson Losses

Petitioner's second and third arguments misunderstand the procedural posture of this case. Petitioner's second argument is, essentially, that Sosa could not have bought the property in question without Petitioner, could not have met the conditions necessary to buy the property for the $160,000 Petitioner paid, and suffered no loss as a result of the sale because the property was worth more than the $240,000 she paid for it. (Pet'r Mem., at unnumbered fourth-sixth pages.) This argument falls flat. Petitioner made a Section 2255 motion to correct his sentence and it was denied by Judge Brieant. This Court does not sit to review Judge Brieant's decisions—that duty belongs to the Second Circuit. The only arguments that are relevant to this Court's decision are arguments that pertain to whether this Court erred in holding that it would be futile to allow Petitioner to amend his petition, and the only arguments that are relevant to that determination are ones that assert that new case law has changed or clarified the governing law so as to make Judge Brieant's sentence retroactively in

error. Since Petitioner cites no new case law (or any case law at all) in making this new argument, this Court finds this argument to be without merit.

Petitioner's third argument is, essentially, that deducting the Sosa and Richardson loss amounts reduces the total loss amount to below the $200,000 threshold and, hence, Petitioner's motion seeking leave to amend was not futile. (Id. at unnumbered sixth-seventh pages.) Petitioner's premise is accurate, but the Court's ruling that Petitioner's motion was futile was not based on the idea that the loss amount would not shrink when certain funds were subtracted. Instead, the Court ruled that the decisions in *United States v. Confredo*, 528 F.3d 143 (2d Cir.2008), *United States v. Leonard*, 529 F.3d 83 (2d Cir.2008), and *United States v. Rutkoske*, 506 F.3d 170 (2d Cir.2007), did not change the law in such a way as to render incorrect Judge Brieant's sentencing calculations. (Op. 12–20.)

### D. The Court's Application of Confredo, Leonard and Rutkoske

Petitioner again reargues the merits of his motion to amend. (Pet'r Mem., at unnumbered eighth-ninth pages.) But, because no new arguments are presented in this motion, the Court will not rehash its analysis of the relevant case law. (Op. 12–14.) However, Petitioner's memorandum does raise a couple of issues worthy of comment.

First, Petitioner persists in his argument that one who makes a profit cannot be said to have suffered a loss. (Pet'r Mem., at unnumbered ninth page.) As a matter of pure logic, this is wrong because one can suffer, as Petitioner's victims did, lost profits. For example, if an investor could buy a share of stock for $10 but is defrauded by his broker and so pays $15, he has been defrauded out of $5 even if he

can turn around and sell the stock for $20. Though the $5 loss may not come directly out of the investor's pocket, it is still a loss because the $5 never enters the investor's pocket as profit when the share is sold. *See LaRue v. De Wolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 128 S.Ct. 1020, 1024 n. 4, 169 L.Ed.2d 847 (2008) (stating that under the common law of trusts, and ERISA, a trustee is chargeable with "any profit that would have accrued to the trust estate if there had been no breach of the trust, including profits forgone" (internal quotation omitted)); *United States v. Males*, 459 F.3d 154, 158 (2d Cir.2006) (noting that "a mail fraud violation may be sufficiently found where the defendant has merely deprived another of a property right" (internal quotations omitted)); *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir.2005) (holding that a defendant may be convicted of mail fraud even if the defendant did not "literally 'obtain' money or property"); *Harris Trust & Savings Bank v. John Hancock Mutual Life Ins. Co.*, 302 F.3d 18, 32 (2d Cir.2002) (upholding the district court's holding that defendant had violated its fiduciary duties arising under ERISA by self-dealing, which "significantly drove down the rate of return"); *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 971 (S.D.N.Y.1989) ("[A] mail fraud claim is sufficient if it is alleged that the defendant intended fraudulently to *deprive* another of money or property." (emphasis in original)); *cf. United States v. Carlo*, 507 F.3d 799, 802 (2d Cir.2007) (per curiam) (noting that a mail fraud conviction may be premised on harm to the victim's property interests due to "deny[ing] the victim the right to control its assets by depriving it of the information necessary to make discretionary economic decisions" (internal quotation omitted)); *United States v. Canova*, 412 F.3d 331, 354 n. 23 (2d Cir.2005) (noting that where the precise loss amount is not "readily quanti-

fiable," the defendant's profit is an alternative basis for calculating loss).

Petitioner is also wrong in his reading of *Confredo*, *Leonard* and *Rutkoske*. The Court stated, (Op. 15), and reaffirms, that *Rutkoske* is not on point, not because Petitioner argues that no loss was suffered, (Pet'r Mem., at unnumbered eighth page), but because *Rutkoske* requires that the loss be proximately caused by the fraud, 506 F.3d at 179–80, which is a separate issue. Moreover, there had never been a serious (or credible) argument that Petitioner's conduct did not cause the victims' loss. *Confredo* and *Leonard* stand for the proposition that, whether calculating intended or actual loss, the value of the loss cannot be assumed to be the face value of the asset infected by fraud. *See Confredo*, 528 F.3d at 152 (holding that when calculating intended loss, a court cannot assume that the face value of a fraudulent loan was the intended loss without giving the defendant a chance to argue he or she intended a lesser loss); *Leonard*, 529 F.3d at 93 (holding that when calculating actual loss, under the circumstances of the fraud at issue, the value of the asset received should have been deducted from the purchase price). Neither case, however, stands for the proposition that lost profit cannot be included in the loss amount.

### E. The Status of the Indymac Loss Amount

▮ Petitioner's arguments concerning the Indymac loss amount are futile. (Pet'r Mem., at unnumbered tenth page.) Even if the Court decided to reconsider that loss amount, it could not, alone, reduce the loss amount below the $200,000 threshold and, hence, would not upset Judge Brieant's imposed sentence. (Op. 20 n. 10.) Petitioner's arguments on this point, therefore could not have "reasonably altered the result before the court." *Mikol*, 554

F.Supp.2d at 500 (internal quotation omitted).

### F. Petitioner's Expenses

Petitioner argues that he is entitled to deduct the expenses he incurred in relation to the fraudulent transactions where those expenses helped his victims. (Pet'r Mem., at unnumbered eleventh-twelfth pages.) Specifically, Petitioner argues that (1) the Sosa loss amount should be reduced by $12,000 because of a heating system installed by Petitioner; (2) the Richardson loss amount should be reduced by the $7,500 given to Trail; (3) the Best Estate loss amount should be reduced to $115,928.70 to reflect closing expenses, fees and mortgage payoffs; and (4) the Best Estate loss amount should be further reduced by $15–20,000 for repairs performed on the property. (Id.)

These four facts must be divided into those put before the Court in the original motion, and governed by Rule 59(e), and those which were not, and, hence, are governed by Rule 60(b)(2). Fact (1) falls in the latter category, because though the fact that a heating system was installed was introduced in the original motion, the amount spent on such installation was not introduced. Fact (4) is in the latter category for the same reason. Fact (2) falls squarely within the former category, as the existence and amount of the Trail "gift" was before the Court. Fact (3) is in the former category for the same reason.

#### 1. Facts Not Before the Court in the Original Motion

Petitioner claims that the new heating system cost Petitioner $12,000 and "estimates" that the repairs to the Best property cost $15–20,000. (Pet'r Mem., at unnumbered eleventh & twelfth pages.) Petitioner cites to nothing in the record which would establish these amounts, nor does the Petitioner offer new documentation or evidence that would establish these amounts. Finally, and most importantly, Petitioner offers no explanation of why evidence establishing these facts could not, with reasonable diligence, have been presented at the original motion. Petitioner is not, therefore, entitled to relief on these claims. See Chance, 331 Fed.Appx. at 843 ("Rule 60(b)(2) provides relief when the movant presents newly discovered evidence that could not have been discovered earlier ...." (internal quotations omitted)).[1]

#### 2. Facts Before the Court in the Original Motion

If the Court held, which it does not, that Petitioner's arguments regarding the Best and Richardson loss amounts were correct, it would still not change this Court's decision on Petitioner's motion seeking leave to amend or Judge Brieant's decision at sentencing. Assuming, arguendo, a $7,500 reduction to the Richardson loss amount brings it down to $27,500. Added to the $80,000 Sosa loss amount and Petitioner's figure for the Best Estate loss amount ($115,928.70), the total loss amount would be $223,428.70 (ignoring the Indymac loss amount), which still surpasses the $200,000 benchmark. Petitioner's arguments, therefore, even if accepted, could not could have "reasonably altered the result before the court." Mikol, 554 F.Supp.2d at 500 (internal quotation omitted).

### G. Certificate of Appealability

■ In a footnote in his Reply Brief, Petitioner requests a COA in the event that this Court denies the instant Motion for Reconsideration. (Reply to Gov't's Resp. to Pet'r's Mot. for Recons. 11 n. 1.) A COA is required to appeal from a final

---

1. To say that Petitioner's request for a hearing, (Pet'r Mem., at unnumbered twelfth page), is too late in the game is an understatement.

order in a habeas corpus proceeding. 28 U.S.C. § 2253(c)(1). Indeed, Judge Brieant declined to issue a COA in this case and the appeal from that decision is currently pending before the Second Circuit. Therefore, Petitioner's request must be denied to the extent that Petitioner seeks a COA for the judgment entered by Judge Brieant in the underlying Section 2255, as this Court denied Petitioner's motion seeking leave to amend, and hence he has no basis on which to revisit Judge Brieant's decision.

■ As for whether a COA should issue either for denial of the instant application, or for the denial of the motion to amend, the Second Circuit has held that COAs are required to appeal from Fed R. Civ. P. 60(b) or 59(e) motions where the decision the court is being asked to amend or reconsider is a decision on the merits. *See Jackson v. Albany Appeal Bureau Unit*, 442 F.3d 51, 53 (2d Cir.2006). Moreover, courts, including the Second Circuit, have assumed, without directly stating, that a COA would be required to appeal the denial of a motion to amend a habeas petition. *See Littlejohn v. Artuz*, 271 F.3d 360, 364 (2d Cir.2001) (granting petitioner a COA on the issue of the district court's denial of leave to amend the petition and vacating the district court's judgment); *accord King v. Ryan*, 564 F.3d 1133, 1137 (9th Cir.2009) (noting that the Ninth Circuit granted a COA on the issue of whether the district court erred in denying leave to amend); *United States v. Perez–Garcia*, 318 Fed.Appx. 236, 236 (4th Cir.2009) (per curiam) (requiring a COA for an appeal from a Fed.R.Civ.P. 15(c)(2) motion); *United States v. Nabor*, 256 Fed.Appx. 669, 670 (5th Cir.2007) (per curiam) (noting that the Fifth Circuit had issued a COA to review a district court's denial of a Fed R. Civ. P. 15(a) motion to amend); *Nguyen v. United States*, No. 97–CV–1592, 2006 WL 3246921, at *1 (E.D.N.Y. Nov. 8, 2006) (refusing to issue a COA when denying a

motion for reconsideration and a motion to amend the petition). The Second Circuit has reasoned that the purpose of the COA requirement is to weed out unmeritorious appeals—a reason which is just as applicable to motions to amend petitions as it is to the merits of the petitions themselves. *See Jackson*, 442 F.3d at 54 (reasoning that the congressional mandate to weed out unmeritorious appeals requires COAs for Rule 59(e) denials); *Kellogg v. Strack*, 269 F.3d 100, 103 (2d Cir.2001) (per curiam) (reasoning that the congressional mandate to weed out unmeritorious appeals requires COAs for Rule 60(b) denials). Putting these decisions together, it is appropriate for Petitioner to seek a COA for this Motion to Reconsider the denied motion seeking leave to amend, though Petitioner's method of raising the issue is, again, perplexing.

■ A COA should only be issued when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). More specifically, the Second Circuit has held that a COA should be issued

> "only if the petitioner shows that (1) jurists of reason would find it debatable whether the district court abused its discretion in denying the Rule [59(e)] motion, and (2) jurists of reason would find it debatable whether the underlying habeas petition, in light of the grounds alleged to support the [Rule 59(e)] motion, states a valid claim of the denial of a constitutional right."

*Jackson*, 442 F.3d at 54 (alterations in original) (quoting *Kellogg*, 269 F.3d at 104 (dealing with Rule 60(b))). Due to the somewhat unusual procedural posture of this case, the second element of this test must be modified such that it means "jurists of reason would find it debatable whether the underlying motion to amend, in light of the grounds alleged to support the Rule 59(e) motion, states a valid claim

**380**

of the denial of a constitutional right." *See Jimenez v. Quarterman,* —— U.S. ——, —— n. 3, 129 S.Ct. 681, 684 n. 3, 172 L.Ed.2d 475 (2009) (stating that when a habeas petition is denied on procedural grounds, the test is whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* . . . whether the district court was correct in its procedural ruling" (internal quotation omitted) (emphasis in original)); *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (same); *Richardson v. Greene,* 497 F.3d 212, 217 (2d Cir.2007) (stating, in general, that the standard is "whether jurists of reason would find it debatable whether the petition states a valid claim" (internal quotation omitted)); *Moshier v. United States,* 402 F.3d 116, 117–18 (2d Cir.2005) (quoting the same standard as in *Jimenez* ).

The Court does not believe that reasonable jurists would find it debatable whether the Court erred in denying the instant 59(e) motion, and so does not need to reach the other grounds. Of the six grounds that Petitioner raises urging reconsideration, one is directly refuted by the record, two misunderstand the procedural posture of the case, one is a simple rehash of the argument that failed in the underlying motion, and the final two are either futile or seek to improperly, and inexplicably, introduce new and previously discoverable factual claims. Petitioner, therefore, has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).[2]

Finally, to the extent that Petitioner seeks a COA for the underlying motion seeking leave to amend, it is also denied. In refusing to issue a COA on that issue, the Court notes the weakness of Petition-

er's Motion for Reconsideration. However, the Court also finds that it acted well within its discretion in denying leave to amend because the "new" law cited by Petitioner "raise[d] no colorable claim" that Judge Brieant's sentencing decision was in error, (Op. 20). *See McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend."). Put simply, a "substantial showing" could only be made if the Court believed that its decision that Petitioner's proposed amendments were futile was a close call. The Court does not believe it was.

### II. Conclusion

Petitioner's Motion for Reconsideration (Dkt. No. 17) is denied. Petitioner's request for a Certificate of Appealability is denied. The Clerk of the Court is respectfully requested to terminate this motion and to close the case.

SO ORDERED.

---

**2.** The Court's analysis is identical for those portions of Petitioner's motion that have been

construed to seek relief under Rule 60(b).